UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

WITHERSPOON HOLDINGS, INC.
d/b/a WITHERSPOON TRANSPORT                                    PLAINTIFF

VS.                                                    CAUSE NO. 5:23-cv-56-DCB-BWR

COYOTE LOGISTICS, LLC                                          DEFENDANT

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

COMES NOW, Witherspoon Holdings, Inc. d/b/a Witherspoon Transport ("Plaintiff") by and through counsel, and files its Complaint against Coyote Logistics ("Defendant") and in support would show as follows:

1. Plaintiff is a corporation organized and existing under the laws of the State of Mississippi and has its principal place of business in Mississippi.

2. Defendant is a single-member limited liability company incorporated under the laws of the State of Tennessee. Coyote is believed to be wholly owned by either Coyote Logistics Midco, Inc., a citizen of Delaware, or UPS, Inc. which is a citizen of a state other than Mississippi. Upon information and belief, no owner of the Defendant is a citizen of Mississippi.

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the amount in controversy in this matter exceeds $75,000.00 exclusive of interest and costs.

4. This Court has personal jurisdiction over this matter and venue is proper pursuant to Miss. Code Ann. § 13-3-57 because the Defendant's tortious conduct occurred in Pike County, Mississippi.

**FACTS**

5. On or about April 22, 2022, Plaintiff accepted a load of Domino Sugar ("the Load") for pickup from Defendant's employee Kolby Keim.

6. The rate confirmation shows the Load is a sealed and "no touch" load as to driver work. The driver was not allowed out of the truck and the load was loaded and sealed at the pickup location.

7. Delivery of the Load took place on April 23, 2022.

8. The Load was accepted in its entirety except one pallet that was the wrong product.

9. This pallet was loaded by the shipper and Plaintiff had no opportunity to inspect the Load prior to leaving the shipper and arriving at the consignee. Therefore, nothing Plaintiff did caused the rejection of this pallet of sugar.

10. In response, the parties made an effort to get a less-than-truckload carrier to pick up the pallet that failed due to coordination by Defendant and the less-than-truckload carrier.

11. When this was abandoned, the parties attempted to negotiate a rate to move the product to a location picked by the shipper. Ultimately, an agreement could not be reached.

12. Plaintiff never once stated it would hold the load hostage or refuse to turn it over if a less-than-truckload carrier arrived for pickup. In fact, the Load is still sitting on the Plaintiff's trailer at its location waiting for someone to pick it up.

13. In several e-mails, Kolby Keim referred the Plaintiff to the Broker-Carrier contract in which he appears to have asserted that Plaintiff must return the rejected shipment at its costs to the point of origin. He appeared to be citing to paragraph 11(G).

14. In the contract Plaintiff signed, it did not state the exact same language, but it had the same meaning in that the carrier was only obligated to return the overage at its expense if it caused the problem.

15. Even though the Plaintiff did not cause the problem, Kolby felt that someone at Coyote or the customer "was being difficult" and he passed on the position of presumably his superior that:

> The fact still remains that the original carrier is responsible for the return of the cargo at the cost of the original carrier (see snip below), not the LTL carrier. No layovers or compensation should be applied for time spent waiting for the LTL carrier to pick up – do (sic) to them agreeing to an LTL carrier to pick up said product.

16. The Plaintiff's agreement states in paragraph 11(G) that "CARRIER shall return all damaged or rejected product to the point of origin or to such other point as instructed by BROKER, at CARRIER's expense (*except to the extent such damaged or rejected product was the result of BROKER's or Customer's negligence).*

17. Despite the Plaintiff's contractually valid position, on June 13, 2022, it is believed that Scott Spears, or some other unknown employee, on behalf of the Defendant and in the course and scope of his employment with Defendant, posted a false and defamatory report on Carrier411's Freightguard ("the Report") platform regarding the Plaintiff's actions. Carrier411 on its website indicates that:

> Carrier411 is the industry-standard ultimate big data platform for brokers, shippers, factoring companies, and other qualified logistics industry professionals. More than 3,000 freight brokers and shippers rely on our platform every day for carrier selection, including 97 of the top 100 brokers based on net income.

Carrier411, https://www.carrier411.com, reviewed June 6, 2023.

18. The Report accused Plaintiff of having "held load hostage" and noted there are "unresolved claim issues." The term "hostage" is an assertion of extortion and illegality.

19. The Report further asserts that the Plaintiff "wanted an excessive accessorial amount before they would release an overage on a shipment."

20. These accusations and assertions are false and were known to be false, or should have been known to have been false, by the Defendant at the time of their posting.

21. During the period immediately after the false Freightguard report was posted by Defendant the Plaintiff suffer a cancellation over twenty (20) contracts with brokers including some of the largest in the industry. Those cancelled agreements and relationship terminations came from Swift, Schneider, Werner, Total Transportation of Mississippi, England Logistics, Cowan Logistics, Convoy, XPO, Dart, US Express, Landstar, EPES and many others.

22. In addition to those contracts and relationships, following the posting when the Plaintiff was able to book a load, it suffered multiple cancellations after booking, some while the truck was in route, citing specifically to the existence of the false Freightguard report for the cancellation.

23. This caused catastrophic losses and effectively ended Plaintiff's ability to cash flow its operations and operate most of its business profitably. The MCS-150 for Plaintiff filed on January 1, 2022, prior to the Freightguard report by Defendant showed six (6) power units and four (4) drivers operated by Plaintiff with over 500,000 miles driven.

24. Following Defendant's publication, trucks have been auctioned or parked. Drivers have been let go. Suits have been filed for failure to pay loans related to the business.

25. Immediately after becoming aware of the Report, Plaintiff diligently acted to have the Report removed but was unsuccessful.

26. Ultimately, Plaintiff retained undersigned counsel who sent a cease-and-desist letter to the Defendant on May 11, 2023, demanding removal of the Report. Following removal, Plaintiff

was able to begin reinstatement of some former customer contracts, such as Werner and Schneider, but for some the damage was permanent, such as RXO.

27. In response to the letter, Defendant removed the Report.

28. Plaintiff has now received notice its insurance is cancelling due to non-payment and it is scrambling to sell even more assets in order raise cash to keep its authority active and at least one truck on the road while it attempts to claw back from the debilitating losses suffered.

29. Plaintiff suffered and continues to suffer damages due to the Report's initial posting and its continued existence for approximately eleven (11) months.

30. Plaintiff incorporates all written instruments referenced in the proceeding paragraphs as composite Exhibit "1" to this Complaint pursuant to Rule 10(c).

31. At all relevant times, employees of the Defendant were acting within the course and scope of their employment and/or agency of the Defendant such that the Defendant is liable for the negligent actions of its employees discussed herein.

### DEFAMATION PER SE

32. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

33. Defendant made false statements on Freightguard concerning Plaintiff, including but not limited to, having "held load hostage" and "want[ing] an excessive accessorial amount before [it] would release an overage on a shipment."

34. These statements are false.

35. Defendant knew or should have known the falsehood of these statements at the time the Report was posted by the Defendant.

36. These allegations published by the Defendant on Freightguard have harmed and continue to harm the Plaintiff and constitute defamation *per se.*

37. The Report was not privileged and the publication of the same is not protected by any privilege or justification.

38. The Report was, at minimum, negligent, and it was published when any cursory review of the relevant documents and/or credible investigation would have shown the Report to be false.

39. The Report on Freightguard is actionable on its face as defamation *per se* and Plaintiff suffered, and continues to suffer, special harm, including damage to its reputation in the industry, damage to its business, loss of profit, and other lost business opportunities.

### INTENTIONAL DEFAMATION/PUNITIVE DAMAGES/ ATTORNEY FEES

40. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

41. As stated in the facts and allegations stated, the falsehood nature of the Report by Defendant on Freightguard was indicative of intent to harm Plaintiff.

42. Specifically, Defendant knew Plaintiff never made a claim to hold a load hostage, but it elected to report the false claim anyway.

43. The Report was made with actual malice and recklessness with the specific intent to harm Plaintiff.

44. Defendant committed an intentional tort. Such intentional tort evidenced malice, recklessness and a specific intent to create harm to the business of Plaintiff.

45. Plaintiff is entitled to compensation for this intentional tort and the harm to its reputation and business arising from such actions.

46. Because the actions of Defendant in this matter were intentional, reckless and committed with malice, Plaintiff is entitled to punitive damages.

47. Should the Court award punitive damages then the Plaintiff is also entitled to its attorney fees for bringing this matter.

## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

48. Plaintiff incorporates as if fully set forth herein all preceding paragraphs, facts and allegations.

49. The actions of the Defendant in interfering in the current and future business relationships of Plaintiff were intentional and willful.

50. Defendant's actions were calculated to cause damages to Plaintiff in its lawful businesses.

51. Defendant's actions were for the unlawful purpose of causing such damage and loss, without right or justifiable cause on the part of Plaintiff and such actions constitute malice.

52. Actual damage and loss resulted to Plaintiff from the tortious interference of the Plaintiff's business relations by the Defendant.

## BAD FAITH BREACH OF CONTRACT

53. Plaintiff incorporates as if fully set forth herein all preceding paragraphs, facts and allegations.

54. Plaintiff and Defendant had a broker-carrier contract under which Defendant tendered loads to the Plaintiff.

55. The broker-carrier agreement contained specific provision for any claims due to loss, damage or delay to cargo. Those provisions set forth a specific methodology by which claims should be handled. Defendant's employee instead took self help remedies in retaliation for its perceived claim against the Plaintiff and lack of patience in working through the contract.

56. These intentional actions violated the duty of good faith found in all contracts such as the one at issue and as such Plaintiff is entitled to damages.

## UNPAID FREIGHT BILLS

57. Plaintiff incorporates as if fully set forth herein all preceding paragraphs, facts and allegations.

58. Defendant owes Plaintiff two outstanding freight bills for loads delivered during the time that Plaintiff was transporting freight for Defendant.

59. Rate Confirmation for Load 26569833 is appended as Exhibit 2 and is past due in the amount of $1,500.00.

60. Rate Confirmation for Load 26580467 is appended as Exhibit 3 and is past due in the amount of $3,450.00.

61. Plaintiff is entitled to be paid for the two appended Rate Confirmations in the amount of $4,950.00 plus all prejudgment and post judgment interest on same as these amounts are liquidated amounts. As of the date of the filing of this Complaint, these amounts remain unpaid.

WHEREFORE, PREMISES CONSIDERED, Witherspoon Holdings, Inc. d/b/a Witherspoon Transport requests this Court assess damages in excess of $75,000.00 against Coyote Logistics, LLC for its own actions and those of its employees and award it damages for the actions of Coyote Logistics, LLC, and such damages to its business and other damages that may be shown at trial, punitive damages and attorney fees and any other relief to which Plaintiff is entitled.

THIS the 7th day of June, 2023.

                Respectfully submitted,

                WITHERSPOON HOLDINGS, INC.
                d/b/a WITHERSPOON TRANSPORT

                By Its Attorneys,

                DunbarMonroe, PLLC

                *s/ Clark Monroe*
                Clark Monroe

OF COUNSEL:
G. Clark Monroe II (MSB #9810)
DunbarMonroe, PLLC
270 Trace Colony Park, Suite A
Ridgeland, Mississippi 39157
601-898-2716 Office
601-898-2074 Facsimile
Email: gcmonroe@dunbarmonroe.com