**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WITHERSPOON HOLDINGS, INC. d/b/a WITHERSPOON TRANSPORT, | |
| Plaintiff, | No. 23-cv-16952 |
| v. | Judge Franklin U. Valderrama |
| COYOTE LOGISTICS, L.L.C., | |
| Defendant. | |

**ORDER**

Although sugar lay at the heart of this case, the relationship between the parties is anything but sweet. In April 2022, Plaintiff Witherspoon Holdings, Inc, d/b/a Witherspoon Transport (Witherspoon), a motor carrier in the freight transport business, transported a truckload of Domino Sugar for Defendant Coyote Logistics L.L.C., (Coyote), a broker for freight transport. However, one pallet of sugar was rejected at delivery. This partially rejected shipment has spawned a protracted battle over who must pay to ship the rejected pallet of sugar back to Coyote. This lawsuit is the culmination of that battle, with Witherspoon suing Coyote for Defamation Per Se, Intentional Defamation; Tortious Interference with Business Relations; Bad Faith Breach of Contract, and Unpaid Freight Bills. R.1,[1] Compl.

---

[1] Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Coyote moves to dismiss Witherspoon's complaint under Rule 12(b)(6). R. 31, Mot. Dismiss. For the reasons below, the Court grants the motion to dismiss and dismisses the complaint without prejudice.

## Background[2]

Witherspoon is a motor carrier in the freight transport business, and Coyote is a broker that arranges freight transportation for its customers—the shippers who own the freight. R. 32, Memo. Dismiss at 1. Witherspoon and Coyote entered into a Carrier Agreement, which set forth the parties' rights and responsibilities in connection to Witherspoon's transportation of freight on behalf of Coyote and its customers. *Id*. In April 2022, Witherspoon transported a truckload of sugar for Coyote. Compl. ¶ 5. However, one pallet of sugar was rejected, and the parties spiraled into dispute over who must incur the costs of shipping the rejected pallet back to Coyote. *Id*. ¶¶ 8–15. At the height of this disagreement, an employee of Coyote posted a report (the Freightguard Report) on Carrier411, an online "data platform for brokers [and] shippers." *Id*. ¶ 17. Among other things, the Freightguard Report contained details about Coyote's negative experience with Witherspoon and accused Witherspoon of holding the rejected sugar "hostage" until Coyote paid for its return. *Id*. ¶ 17–18. Witherspoon, characterizing this report as false, alleges that it caused Witherspoon "catastrophic losses," as over twenty brokers then terminated their agreements to ship freight with Witherspoon.

---

[2]The Court accepts as true all the well-pled facts in Plaintiffs' complaint and draws all reasonable inferences in favor of Plaintiffs. *Platt v. Brown*, 872 F.3d 848, 851 (7th Cir. 2017).

So, Witherspoon sued Coyote, asserting state law claims[3] for Defamation Per Se (Count I), Intentional Defamation (Count II); Tortious Interference with Business Relations (Count III); Bad Faith Breach of Contract (Count IV), and Unpaid Freight Bills (Count V). *See* Compl. Coyote moves to dismiss Witherspoon's complaint in its entirety. The fully briefed motion is before the Court.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Under Rule 8(a)(2), a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, a complaint need only contain factual allegations, accepted as true, sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). The allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

---

[3]The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the matter is one between citizens of different states and the amount in controversy exceeds $75,000.

3

**Analysis**

Coyote advances three arguments in support of dismissal. *See* Memo. Dismiss. First, Coyote maintains that Witherspoon fails to state any defamation claims because it fails to allege that the Freightguard Report contained false statements. Second, Coyote asserts that Witherspoon's tortious interference claim should likewise be dismissed, as (1) the Freightguard Report is truthful and (2) Witherspoon fails to allege the necessary elements for the claim. Third, Coyote argues that, because it was *Witherspoon* who breached the Carrier Agreement, Witherspoon's breach of contract and unpaid freight bills claims fail. Last, Coyote contends that the Carrier Agreement bars certain forms of relief that Witherspoon seeks pursuant to its limitation of liability provision. The Court addresses each argument in turn.

**I.   Defamation (Counts I and II)**

In Counts I and II, Witherspoon asserts a claim for defamation *per se* and intentional defamation, alleging that Coyote made false statements in the Freightguard Report, including falsely stating Witherspoon was holding the rejected sugar "hostage" and that Witherspoon "wanted an excessive accessorial amount before [it] would release an overage on a shipment." Compl. ¶ 33.

Illinois law[4] defines defamation as "the publication of a false statement that 'tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person.'" *Lott v.*

---

[4] Where federal jurisdiction is based on diversity of citizenship, courts apply the substantive law of the forum state. *See Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018); *see also Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021).

*Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (quoting *Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006)). To state a claim for defamation, a plaintiff must allege that "the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia Tech., LLC v. Specialty Publ. Co.*, 852 N.E.2d 825, 839 (Ill. 2006).

In terms of damages, "Illinois recognizes two types of defamation: defamation *per se* and defamation *per quod*." *Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 532 (7th Cir. 2009). "If a statement's defamatory character is obvious and apparent on its face, it is considered defamation *per se*, with the law then presuming damages." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831–32 (7th Cir. 2019) (cleaned up).[5] Illinois law recognizes five categories of statements that are considered defamatory *per se*, including "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties [and] words that impute a person lacks ability or otherwise prejudices that person in her or his profession."[6] *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). Defamation *per quod*, on the other hand, requires that a plaintiff actually demonstrate that the false statement caused him harm. *Pippen v. NBCUniversal*

---

[5] This Order uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

[6] The remaining categories are as follows: "words that impute a person has committed a crime, "words that impute a person is infected with a loathsome communicable disease," and "words that impute a person has engaged in adultery or fornication"

5

*Media, LLC,* 734 F.3d 610, 612–13 (7th Cir. 2013). Witherspoon asserts both defamation *per se* and defamation *per quod*.

Coyote attacks only the first element of defamation: whether Witherspoon has sufficiently alleged that Coyote made a false statement. First, Coyote asserts that it made only true or substantially true statements in Freightguard Report and thus cannot be sued for those statements. Memo. Dismiss at 4–5 (citing *Waugh v. Morgan Stanley & Co.*, 966 N.E.2d 540, 549 (Ill. App. Ct. 2012)). Second, Coyote claims that the Freightguard Report contained only opinions of contract interpretation, again precluding Witherspoon from stating a claim. The Court addresses each in turn.

**A.     Truth**

A plaintiff may not base a defamation claim on statements that are "substantially true." "The 'substantial truth' is shown where the 'gist' or 'sting' of the allegedly defamatory material is true." *Coghlan v. Beck,* 984 N.E.2d 132, 146, (Ill. App. Ct. 2013) (cleaned up). While the question of substantial truth is usually reserved for the jury, it may be resolved as a matter of law if "no reasonable jury could find that substantial truth had not been established." *Id.* (cleaned up). The question here, therefore, is whether Coyote has established, as a matter of law, the truth of its statements.

Coyote focuses on the truthfulness of the phrase "held load hostage," positing that this statement is not actionable because it is true or substantially true. Memo. Dismiss at 5. According to Coyote, the phrase "held load hostage" is "well-known industry lingo with a precise statutory definition." *Id*. In support of this assertion,

6

Coyote points to 49 U.S.C. § 14915, titled "Penalties for failure to give up possession of household goods," and argues that this federal statute defines the act of holding a shipment "hostage" as "the knowing and willful failure, in violation of a contract, to deliver to, or unload at, the destination of a shipment of household goods . . . ." *Id.* (citing 49 U.S.C. § 14915(c)). When viewed in this context, insists Coyote, "use of the phrase 'held load hostage' can only be construed as industry terminology referring to a carrier's breach of contract and refusal to deliver a shipment." *Id*. From Coyote's perspective, based on the language of the Carrier Agreement, it is a "fact" that Witherspoon breached the Carrier Agreement when it refused to return the rejected sugar at its own expense. Thus, Coyote reasons, the accusation that Witherspoon held the rejected sugar "hostage" is not actionable.

Witherspoon counters that Coyote's argument is improper for a motion to dismiss under Rule 12(b)(6). That is, Witherspoon argues that (1) whether "held load hostage" is in fact well-known industry terminology "is a fact question that may potentially require expert testimony;" and (2) even if the Court considers the phrase "held load hostage" to mean a refusal to return a shipment in breach of a contract, whether Witherspoon's refusal here breaches the Carrier Agreement is a question for the jury. R. 39, Resp., at 2.

The Court agrees with Witherspoon. Whether the phrase "held load hostage" constitutes a well-known industry term and whether that term adheres to the definition Coyote sets forth is a question of fact that is inappropriate to resolve at the motion to dismiss stage. *See Burnett v. CNO Fin. Grp., Inc.*, 2025 WL 1027464, at \*3

7

(S.D. Ind. Mar. 26, 2025) (explaining that experts frequently "testify about industry terms of art, professional standards, and typical practices"); *see also United States v. Johnson*, 152 F.3d 618, 629 n.9 (7th Cir. 1998) (expert testimony may establish the meaning of a "term of art" in a particular field). And even if the phrase "held load hostage" does refer to, as Coyote states, "a carrier's breach of contract and refusal to deliver a shipment," the question of whether Witherspoon breached the Carrier Agreement is far from answered at this early stage. *Bonchon U.S.A., Inc. v. Aaron Allen & Assocs., LLC*, 2024 WL 1363422, at *5 (N.D. Ill. Mar. 30, 2024) ("Whether there has been a breach of contract—and the materiality of that breach—is generally a question of fact.") (citing *Mohanty v. St. John Heart Clinic*, 866 N.E.2d 85, 96 (Ill. 2006). In pertinent part, the Carrier Agreement provides that:

> G. <u>Return of Damaged or Rejected Shipments</u>. CARRIER shall return all damaged or rejected product to the point of origin or to such other point as instructed by BROKER, at CARRIER's expense (*except to the extent such damage or rejected product was the result of BROKER's or Customer's negligence*).

Memo. Dismiss, Exh. 1, Carrier Agreement, ¶ 11 (emphasis added). As Witherspoon correctly argues, there exist several outstanding questions of fact as to whether the sugar was rejected due to Coyote's negligence, thereby excusing Witherspoon from having to return the sugar to Coyote at its own expense. Resp. at 2. In short, it is too early for the Court to determine, *as a matter of law*, whether "held load hostage" is a substantially true statement.

### B. Opinion

Next, Coyote argues that the statements in the Freightguard Report "are

8

opinions of Coyote with regard to the roles and responsibilities of the parties" under the Carrier Agreement. Memo. Dismiss at 8 (citing M*cDavid Knee Guard, Inc. v. Nike USA, Inc.*, 2010 WL 3000178 (N.D. Ill. July 28, 2010)). Witherspoon responds that Coyote's cited authority is distinguishable, as the defendant's statements in *McDavid* spoke to each side's interpretation of ambiguous terms in their contract.

"Opinions that do not misstate actual facts are protected by the First Amendment and thus not actionable." *Huon v. Denton*, 841 F.3d 733, 744 (7th Cir. 2016). And that is so "even when the opinions concern one of the five defamation *per se* categories under Illinois law." *Bd. of Forensic Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019). In determining whether a statement is one of opinion or fact, Illinois law "draws no firm dividing line." *Id*. In that endeavor, "[c]ourts consider whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Id*. (cleaned up). As the Seventh Circuit has explained, "[c]ontext is key, as it matters not only what was said, but who said it, where it was said and the broader setting of the challenged statement." *Id*.

*McDavid* is indeed distinguishable. In *McDavid*, the parties were sellers of sports apparel. The defendant, Nike, "had exclusive supplier agreements with several colleges and universities," which made it "the exclusive supplier of athletic competition apparel for those schools." 2010 WL 3000178, at *1. Nike then made statements to those schools that, pursuant to these agreements, the school's athletes were prohibited from wearing the plaintiff's athletic apparel. *Id*. The plaintiff

9

disagreed that the agreements prohibited school athletes from wearing his apparel and brought various claims against Nike based on these allegedly false statements. *Id*. The district court ultimately found that (1) Nike's exclusive supplier agreements were ambiguous as to whether the contracting schools' athletes were allowed to wear the plaintiff's apparel, and (2) Nike's statements to those schools interpreting the agreements "is not a fact but an opinion which is not actionable[.]" *Id*. at *4.

Here, the Freightguard Report stated that Witherspoon "held load hostage" and "wanted an excessive accessorial amount before [it] would release an overage on a shipment." Compl ¶ 33. The Court agrees with Witherspoon that these statements are fundamentally different than those in *McDavid*. Coyote's statements here do not so much as interpret an ambiguous contract as they do accuse Witherspoon of materially breaching the Carrier Agreement and making unreasonable demands in resolving the contractual dispute. And Coyote does not engage with any of the factors that would allow this Court to comprehensively evaluate whether its statements were constituted opinion. *Bd. of Forensic Exam'rs, Inc.*, 922 F.3d 832 ("whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content"). Accordingly, in viewing the complaint in the light most favorable to Witherspoon, the Court finds that Witherspoon has sufficiently alleged the Freightguard Report contained false statements of fact, not legal opinion.

Recall that Coyote makes no arguments challenging the sufficiency of Witherspoon's allegations regarding the two remaining elements of defamation.

10

*Supra* at 6. That is, Coyote makes no argument that Witherspoon has failed to allege it "made an unprivileged publication" of the Freightguard Report to a third party or that the publication of the Freightguard Report caused damages. *Solaia*, 852 N.E.2d at 839. Accordingly, having found that Witherspoon has sufficiently alleged Coyote's false statements of fact, the Court denies Coyote's motion to dismiss Counts I and II on this basis.

The Court now turns to whether Witherspoon has sufficiently alleged a claim for tortious interference with business relations.

## II. Tortious Interference with Business Relations (Count III)

In Count III, Witherspoon alleges that Coyote's actions interfered with Witherspoon's current and future business relationships, causing actual damages and loss. Compl ¶¶ 48-52.

"To state a claim for tortious interference with [prospective] business relations under Illinois law, a plaintiff must allege the following: "(1) that plaintiff had a business relationship or a reasonable expectation of entering into a valid business relationship; (2) that defendant had knowledge of that relationship or expectancy; (3) that defendant intentionally interfered, inducing or causing a breach or termination of the relationship or expectancy; and (4) that plaintiff suffered damages as a result." *Hard Lens Media, Inc. v. Chicago Corner, LLC*, 2025 WL 1787520, at *3 (N.D. Ill. June 27, 2025) (cleaned up); *see also Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999). "Under Illinois law, commercial competitors are privileged to interfere with one another's prospective business relationships provided their

11

intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1019 (Ill. 2008).

To state a claim for tortious interference with current business relations, also known as tortious interference with contractual relations, a plaintiff must plead: "(1) the existence of a contract; (2) the defendants' awareness of the contract; (3) the intentional inducement of a contract breach; (4) an actual breach of the contract; and (5) damages." *Cody v. Harris*, 409 F.3d 853, 859 (7th Cir. 2005).

Coyote first argues that Witherspoon's tortious interference claim fails overall because the statements contained in the Freightguard Report were truthful. Memo. Dismiss at 9. As explained *supra* at 6–8, the Court cannot find at this early stage that the Freightguard Report contained only true or substantially true information.

With respect to Witherspoon's claim of tortious interference with prospective business relations, Coyote asserts that Witherspoon "fails to allege that it has a reasonable expectation of entering into a valid business relationship and that [Coyote] knew of [Witherspoon's] expectancy." *Id*. Witherspoon rejects this argument, stating it has alleged that Coyote purposefully published the Freightguard Report to a forum where Coyote knows that customers of [Witherspoon]—like Coyote—will look to vet other motor carriers. Coyote was purposefully and knowingly telling [Witherspoon's] current and potential future customers not to do business with [Witherspoon] via a forum it knew they checked." Resp. at 9. The Court finds that Witherspoon has the better of the argument. When viewing the allegations in the

12

light most favorable to Witherspoon and drawing all inferences in its favor, Coyote's publication of the Freightguard Report "to a specific forum designed to provide information to potential future customers and keep those same customers up to date on their current motor carriers creates a reasonable inference that Coyote knew of [Witherspoon's] expectancy of future business and was intentionally attempting to interfere with the same." *Id*. Coyote does not challenge the other elements for a tortious interference with prospective business relations.

As for tortious interference with contractual relations, Coyote argues that: (1) Witherspoon does not allege that Coyote was aware of any of Witherspoon's contracts with other brokers; (2) Coyote intended for these brokers to cancel their contracts; (3) or (3) the brokers breached their contracts with Witherspoon. Memo. Dismiss at 10. Witherspoon's response is limited to a single sentence: "[b]ecause Carrier411 is also used to monitor current carriers, [Coyote] also knew such post would cause contract cancellations." Resp. at 9. While that may be true, more than Coyote's knowledge of potential cancellations is required to state a claim for tortious interference with contractual relations. As Coyote points out, Witherspoon's complaint is devoid of any allegations that Coyote intended for brokers to cancel their contracts with Witherspoon or that the cancellations amounted to a breach of contract. Accordingly, the Court grants Coyote's motion to dismiss Count III to the extent it presents a claim for tortious interference with contractual relations.

**III.    Breach of Contract and Unpaid Freight Bills (Counts IV & V)**

In Count IV, Witherspoon asserts a breach of contract claim. To state claim for breach of contract under Illinois law, a plaintiff "must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) the resultant damages." *Hongbo Han v. United Cont'l Holdings., Inc.*, 762 F.3d. 598, 600 (7th Cir. 2014) (internal citations and quotations omitted).

Witherspoon alleges that the Carrier Agreement "contained specific provision[s] for any claims due to loss, damage or delay to cargo." Compl. ¶ 55. Witherspoon further alleges that Coyote ignored these provisions' specific methodology for handling claims and instead "resorted to the self-help remedy of defaming" Witherspoon. Resp. at 10; *see also* Compl. ¶¶ 53–56. Coyote's argument challenging the sufficiency of Witherspoon's breach of contract claim amounts to: "Coyote didn't breach the contract—Witherspoon did." Memo. Dismiss at 11 (stating that Witherspoon "failed to perform under the [Carrier] Agreement, and thus cannot maintain a cause of action for Breach of Contract."). This argument is a non-starter. As explained *supra* at 7–8, there are several questions of fact that must be resolved before it can be determined whether Witherspoon breached the Carrier Agreement.

In Count V, Witherspoon "alleges simple breach of contract regarding unpaid freight bills." Resp. at 10. Coyote argues that Witherspoon fails to state a claim because it has rightfully withheld these payments to satisfy Witherspoon's debt related to the rejected pallet of sugar. Again, Coyote's argument depends on the Court

14

making a finding that Witherspoon breached the Carrier Agreement. For the reasons already stated, the Court declines to so find.

Viewing the allegations of Witherspoon's complaint in the light most favorable to Witherspoon, the Court finds that Witherspoon sufficiently alleges a breach of contract claim and denies Coyote's motion to dismiss Counts IV and V on this basis.

### IV. Limitation of Liability

Next, Coyote contends that Witherspoon "seeks various forms of relief that are expressly precluded by the [Carrier] Agreement's limitation of liability provision." Memo. Dismiss at 12. In particular, Coyote maintains that, pursuant to the Carrier Agreement, Witherspoon may not recover for "special damages, damages for harm to [Witherspoon's] reputation, damages for injury to [Witherspoon's] business, loss of profit, lost business opportunities, punitive damages, and prejudgment and post judgment interest on certain damages." *Id.*; *see also* Carrier Agreement, ¶ 11(J).

Witherspoon first retorts that the limitation of liability is substantively unconscionable. Resp. at 11–14. "The determination of whether a contract or a portion of a contract is unconscionable is a question of law." *Cannon v. Burge*, 752 F.3d 1079, 1102 (7th Cir. 2014). Under Illinois law, substantive unconscionability "concerns the actual terms of the contract and examines the relative fairness of the obligations assumed, asking whether the terms are so one-sided as to oppress or unfairly surprise an innocent party." *Id.* (citing *Phoenix Ins. Co. v. Rosen,* 949 N.E.2d 639, 647 (Ill. 2011)).

15

Beyond citations for general propositions of law, Witherspoon provides no case law regarding when terms of a contract become so one-sided as to "create a significant imbalance in the obligations and rights of the parties." Resp. at 11. While the Court does not expect citations to authority that always mirror the exact circumstances of the case at hand, it does expect citations to cases that generally support a party's arguments. Here, Witherspoon provides the Court with none. "The job of the district court is not to perform legal research for the parties, filling in gaps in papers filed before the court." *S Indus., Inc. v. World of Weapons*, 1997 WL 17796, at *2 (N.D. Ill. Jan. 15, 1997). Accordingly, based on the record before it, the Court does not find that the Carrier Agreement's limited liability provision is substantively unconscionable.

Witherspoon next asserts that the limitation on liability is also unenforceable as it is against public policy. Resp. at 14. "Illinois courts have long held that contractual limitations will not be voided unless the limitations are against the settled public policy of the state." *TIG Ins. Co. v. Smith*, 243 F. Supp. 2d 782, 784 (N.D. Ill. 2003); *see also, e.g., First Fin. Ins. Co., v. Purolator Sec., Inc.,* 388 N.E.2d 17 (Ill. 1979). "This power to void, however, should be used sparingly and only if the contract is clearly contrary to what the constitution, the statutes or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare." *Id.* (cleaned up) (citing *First Nat'l Bank of Springfield v. Malpractice Research, Inc.,* 688 N.E.2d 1179, 1182 (Ill. 1997).

Here, Witherspoon has not demonstrated that the limitation of liability is "clearly contrary to what the constitution, the statutes or the decisions of the courts

16

have declared to be the public policy" of Illinois. Witherspoon cites Section 5 of Article II of the Illinois Constitution of 1870 and *Stephens v. Kasten*, 48 N.E. 2d 508 (Ill. 1943), both of which contain general platitudes supporting the right to a remedy at law. Resp. at 14–15; Ill. Const. 1870, art. II, § 5 ("The right of trial by jury as heretofore enjoyed, shall remain inviolate."); *Stephens*, 48 N.E. 2d at 511 ("The [Illinois] constitution does not guarantee to the citizen the right to litigate without expense, but simply protects him from the imposition of such terms as unreasonably and injuriously interfere with his right to a remedy in the law, or impede the due administration of justice.") Based on these broad generalities, Witherspoon invites the Court to void a limitation of liability provision as "clearly contrary" to Illinois public policy. The Court declines the invitation.

Last, Witherspoon contends that Coyote is equitably estopped from raising the limitation of liability provision as a defense. Resp. at 16. From Witherspoon's perspective, it has sufficiently pled that Coyote materially breached the Carrier Agreement, thus estopping Coyote from enforcing the limitation of liability provision. *Id*. The Court disagrees. As Coyote correctly points out, if Witherspoon's proposition were true, "limitation of liability provisions would rarely, if ever, be enforced, because the defendant in a contract action is always accused of breaching the parties' contract." R. 40, Reply, at 9; *see also Ellison Techs., Inc. v. Radical Firearms, LLC*, 2019 WL 5963612, at *5 (N.D. Ill. Nov. 12, 2019) (rejecting the proposition that a breach of contract renders a limitation on liability unenforceable). Witherspoon's citation to *Dubey v. Public Storage, Inc.*, 918 N.E.2d 265 (Ill. 2009) does not change

17

this calculus, as the appellate court in that case found the limitation on liability provision unenforceable because it was substantively unconscionable—not because the plaintiff sufficiently pled a breach of contract claim.

Accordingly, on the record before it, the Court finds that the Carrier Agreement's limitation of liability provision is enforceable, and that Witherspoon's damages shall not include "any indirect, punitive, special, incidental, or consequential damages, or loss of profits[.]" Compl., Exh. 1, ¶ 11(J).

## Conclusion

For the foregoing reasons, the Court grants Coyote's motion to dismiss. Count III is dismissed to the extent it asserts a tortious interference with contractual relations claim. Counts I–V are dismissed without prejudice insofar as they request damages that Witherspoon may not recover. Witherspoon may file an amended complaint on or before October 7, 2025. If Witherspoon files an amended complaint on or before October 7, 2025, the Court directs Coyote to answer or otherwise respond on or before October 21, 2025.

Dated: September 23, 2025

_____
United States District Judge
Franklin U. Valderrama